UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| MICHAEL TRACY MCLAUGHLIN,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>JO GENTRY, et al.,<br><br>　　　　Respondents. | Case No. 2:11-cv-00884-JCM-VCF<br><br>**ORDER** |

**I.    Introduction**

This is a habeas corpus action under 28 U.S.C. § 2254. The Ninth Circuit has remanded for a <u>de novo</u> determination on ground 1 of the first amended petition (ECF No. 27), whether trial counsel provided ineffective assistance by not presenting a defense of voluntary intoxication. The court determines that counsel did not provide ineffective assistance, and the court denies the petition.

**II.   Factual and Procedural Background**

On December 10, 2002, petitioner Michael McLaughlin attacked at least four people in the Clark County Social Services office in Henderson, Nevada. Three people, Kathryn Atkinson, Steven Glenn, and Susan Rhodes, were stabbed and kicked, with serious injuries. A fourth person, Edward Johanns, was hit and cut in his head.

1

McLaughlin was charged with three counts of attempted murder with the use of a deadly weapon, for his attacks on Atkinson, Glenn, and Rhodes, one count of battery with a deadly weapon, for his attack on Johanns, and one count of burglary while in possession of a deadly weapon. Ex. 47 at 2-3 (ECF No. 29-1 at 3-4). The burglary occurred in the middle of the attacks. McLaughlin had exited the building to attack Atkinson. Glenn, an unarmed security guard, intervened. McLaughlin stabbed Glenn. Glenn retreated into the building. McLaughlin followed Glenn into the building, thus performing the act of entry needed for burglary. See Nev. Rev. Stat. § 205.060. Lynn Avants represented McLaughlin. The jury found McLaughlin guilty as charged. Ex. 54 (ECF No. 29-8). The prosecution sought adjudication of McLaughlin as a habitual criminal under Nev. Rev. Stat. § 207.010. Ex. 47 at 5-6 (ECF No. 29-1 at 6-7). The trial court declined to adjudicate McLaughlin as a habitual criminal. Instead, the trial court imposed sentences that, in the aggregate, had a minimum term of 52 years.[1] Ex. 63 (ECF No. 29-17).

**III.   Legal Standard**

   **A.   Ineffective Assistance of Counsel**

"[T]he right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 & n.14 (1970). A petitioner claiming ineffective assistance of counsel must demonstrate (1) that the defense attorney's representation "fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694. "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

---

[1] McLaughlin has since received habeas corpus relief in the state courts for the calculation of his minimum aggregate term. McLaughlin v. Williams, No. 73232-COA, 2018 WL 1896352 (Nev. App. Apr. 11, 2018). Under the version of Nev. Rev. Stat. § 209.4465 in effect at the time, credits that he earns in prison apply to his minimum aggregate term. Williams v. State Dep't of Corr., 402 P.3d 1260 (Nev. 2017). According to the Nevada Department of Corrections' inmate information website, McLaughlin's parole-eligibility date has advanced from December 2052 to October 2035. https://ofdsearch.doc.nv.gov/form.php

1        Strickland expressly declines to articulate specific guidelines for attorney performance
2   beyond generalized duties, including the duty of loyalty, the duty to avoid conflicts of interest, the
3   duty to advocate the defendant's cause, and the duty to communicate with the client over the
4   course of the prosecution.  466 U.S. at 688.  The Court avoided defining defense counsel's duties
5   so exhaustively as to give rise to a "checklist for judicial evaluation of attorney performance. . . .
6   Any such set of rules would interfere with the constitutionally protected independence of counsel
7   and restrict the wide latitude counsel must have in making tactical decisions."  Id. at 688-89.
8        Review of an attorney's performance must be "highly deferential," and must adopt
9   counsel's perspective at the time of the challenged conduct to avoid the "distorting effects of
10  hindsight."  Strickland, 466 U.S. at 689.  A reviewing court must "indulge a strong presumption
11  that counsel's conduct falls within the wide range of reasonable professional assistance; that is,
12  the defendant must overcome the presumption that, under the circumstances, the challenged
13  action 'might be considered sound trial strategy.'"  Id. (citation omitted).
14       The Sixth Amendment does not guarantee effective counsel per se, but rather a fair
15  proceeding with a reliable outcome.  See Strickland, 466 U.S. at 691-92.  See also Jennings v.
16  Woodford, 290 F.3d 1006, 1012 (9th Cir. 2002).  Consequently, a demonstration that counsel fell
17  below an objective standard of reasonableness alone is insufficient to warrant a finding of
18  ineffective assistance.  The petitioner must also show that the attorney's sub-par performance
19  prejudiced the defense.  Strickland, 466 U.S. at 691-92.  There must be a reasonable probability
20  that, but for the attorney's challenged conduct, the result of the proceeding in question would have
21  been different.  Id. at 694.  "A reasonable probability is a probability sufficient to undermine
22  confidence in the outcome."  Id.
23       **B.    Voluntary Intoxication**
24       "No act committed by a person while in a state of insanity or voluntary intoxication shall
25  be deemed less criminal by reason of his condition, but whenever the actual existence of any
26  particular purpose, motive or intent is a necessary element to constitute a particular species or
27  degree of crime, the fact of his insanity or intoxication may be taken into consideration in
28

1  determining the purpose, motive or intent." Nev. Rev. Stat. § 193.220 (1995).[2] "In order for a
2  defendant to obtain an instruction on voluntary intoxication as negating specific intent, the
3  evidence must show not only the defendant's consumption of intoxicants, but also the intoxicating
4  effect of the substances imbibed and the resultant effect on the mental state pertinent to the
5  proceedings." Nevius v. State, 699 P.2d 1053, 1060 (1985).

**IV.   Discussion**

  **A.   Deficient Performance**

    **1.   McLaughlin's medical and arrest records**

On December 9, 1995, McLaughlin went to the emergency room at St. Rose hospital in Henderson. He complained that Martians were attacking him. He also was questioning his mother's every move. His mother, Marva Bennett, said that McLaughlin had ingested methamphetamine. A urine screen tested positive for methamphetamine. Ex. 151 (ECF No. 33-1 at 35-36).

On June 19, 1996, McLaughlin went to the emergency room at St. Rose hospital. He was agitated and confused. He told emergency room personnel that he had ingested methamphetamine. A Foley catheter was inserted through his urethra into his bladder, and it was inflated. McLaughlin pulled the inflated Foley catheter through his urethra, causing much bleeding. Ex. 151 (ECF No. 33 at 36-37).

On December 10, 2002, after McLaughlin's attack at the social services office, police brought McLaughlin to the emergency room at St. Rose hospital, for treatment of wounds on his hands. McLaughlin told emergency room personnel that he had smoked marijuana. Ex. 151 (ECF No. 33 at 6). McLaughlin was unable, because he was in handcuffs, and unwilling to sign the hospital's paperwork. Ex. 151 (ECF No. 33 at 14). McLaughlin testified at the state-court evidentiary hearing, much later, that he had not told the emergency room personnel that he had ingested methamphetamine because use of methamphetamine was socially unacceptable. Ex. 125 at 40-41 (ECF No. 31-9 at 41-42).

---

[2] A 2003 amendment removed the references to insanity.

4

After McLaughlin's wounds were treated at the hospital, the police brought McLaughlin to the police station. A detective warned McLaughlin about speaking in accordance with Miranda v. Arizona, 384 U.S. 436 (1966). McLaughlin said that he had nothing to say, and the discussion ended there. Ex. 2 at 2 (ECF No. 28-2 at 3).

McLaughlin's behavior in 1995 and 1996 is not the same as his behavior in 2002. His earlier behavior was bizarre, delusional, and self-destructive. In the earlier events, he believed that he was being attacked by Martians, and he gravely injured himself. In December 2002, he attacked county employees who had not given him any assistance, he understood the Miranda warnings, and he exercised his rights under the Fifth Amendment. Based upon that information, a reasonable attorney in Avants' position would not think that a methamphetamine-induced psychosis played any part in McLaughlin's attack on the social services office.

### 2. Steven Glenn's preliminary hearing testimony

Glenn's preliminary-hearing testimony did provide a hint to Avants that drugs might be involved. On direct examination, he testified:

> I was still backpedaling, trying to get away from him. He lunged at me. I used my right hand to lock him up in an arm bar. I have almost two decades of martial arts training and with tactical application, I have almost 27 years of experience. I locked him up in a very well, what should have been a very painful joint manipulation that he should not have been able to extricate himself from, and he pulled out of my grip like my fingers were made of butter. At that point, it was very obvious to me that—

Ex. 5 at 131 (ECF No. 28-5 at 132). The prosecutor stopped him from completing that last sentence. Id. McLaughlin argues that Glenn was about to testify that McLaughlin was intoxicated. ECF No. 27 at 18. At the very least, a reasonable defense attorney could infer from Glenn's cut-off statement that Glenn thought that McLaughlin was intoxicated. Knowing this, Avants should have inquired into the possibility of a voluntary-intoxication defense under Nev. Rev. Stat. § 193.220.

### 3. McLaughlin's proper-person motion for a psychological evaluation

On August 11, 2003, about seven months after the preliminary hearing, McLaughlin filed a proper-person motion for a psychological evaluation. Ex. 14 (ECF No. 28-14 at 24-27).[3] He

---

[3] The court cites to an attachment to McLaughlin's motion to dismiss counsel. McLaughlin filed the motion

5

stated that both the prosecutor and Avants heard testimony from two witnesses that called into question his mental capacities. ECF No. 28-14 at 25. He also stated that Avants sidestepped the issue every time he brought it up, and he concluded that he and Avants disagreed on the defense strategy. Id. McLaughlin did not state in the motion whether drugs or something else had affected his mental capacities. Nonetheless, from the perspective of Avants at the time of the filing of the motion in August 2003, it would be another indication that he should investigate a voluntary-intoxication defense.

### 4. McLaughlin as a source of information

McLaughlin and Avants disagree whether McLaughlin had told Avants that he had ingested methamphetamine on the night of December 9-10, 2002. However, even if McLaughlin said nothing, Avants had enough information from the preliminary hearing and the motion for a court-ordered psychological evaluation to start investigating a voluntary-intoxication defense. At trial, McLaughlin would have the burden of producing evidence to show that he had ingested methamphetamine. See Nevius, 699 P.2d at 1060. Avants thus needed to find that evidence. McLaughlin could have testified, but Avants did not want McLaughlin's lengthy criminal record to be brought before the jury.

Avants did not need to confront McLaughlin directly at first about McLaughlin's use of methamphetamine. Avants could have contacted McLaughlin's family. Alan White, McLaughlin's brother, would have told Avants that he had kicked McLaughlin out of his house because of McLaughlin's continued use of drugs. Ex. 154 (ECF No. 33-4). Marva Bennett, McLaughlin's mother, would have said that McLaughlin appeared high on the morning of McLaughlin's attacks. Ex. 153 (ECF No. 33-3). If Avants had gathered all that information, then he could have confronted McLaughlin. McLaughlin then could have given Avants the one piece of information that only McLaughlin knew, that he had ingested methamphetamine with Jason Johnson the night before the attacks.

---

requesting a court-ordered psychological evaluation as a separate exhibit to the first amended petition, but that exhibit is missing a page. See Ex. 12 (ECF No. 28-12).

### 5. Jason Johnson's evidence

After White kicked McLaughlin out of the house, McLaughlin went to the Pittman area of Henderson, where his mother lived. That night, McLaughlin encountered Jason Johnson on the street; Johnson testified at this court's evidentiary hearing. ECF No. 125 at 21-22. They went to Johnson's mother's house, also in the Pittman neighborhood, and ingested drugs, including around 500 grams of methamphetamine. Id. at 22-24.

Johnson was not a reliable witness. Obviously, he was a methamphetamine user. He also was in trouble with the law. The investigator for McLaughlin's counsel located him at a prison in Arizona, convicted of fleeing the scene of an accident with serious bodily injury. ECF No. 125 at 26. Nonetheless, the court finds no reason not to believe Johnson's testimony that he and McLaughlin had ingested methamphetamine.

### 6. The intoxicating effects of methamphetamine

Avants also would have needed to produce evidence about the intoxicating effects of methamphetamine. See Nevius, 699 P.2d at 1060. Dr. Lipman provided that evidence in this court's evidentiary hearing. ECF No. 125 at 104-20. The court need not re-state his testimony at length. It is enough to note that methamphetamine is a powerful drug, and continued use of methamphetamine leaves a person at risk to fall into methamphetamine-induced psychosis.[4] Avants undoubtedly could have retained an expert to testify about the intoxicating effects of methamphetamine.

### 7. The effects that methamphetamine had on McLaughlin

Avants would have needed to produce evidence about the effects that the methamphetamine had on McLaughlin. See Nevius, 699 P.2d at 1060. He would not have been able to produce any physical evidence of the methamphetamine that was present in McLaughlin at the time of the attacks. McLaughlin did not tell the St. Rose emergency room personnel that he had ingested methamphetamine, and the emergency room personnel thus never performed any

---

[4] The term that Dr. Lipman used is "psychotomimetic," "the effect of a drug that produces a condition in humans or animal models which resembles, in all respects, the condition that we would call psychosis in normal endogenous psychiatric parlance." ECF No. 125 at 83-84. Despite the imprecision of the phrase "methamphetamine-induced psychosis," it or something close to it is the phrase that the parties and courts have used, and this court will continue to use it.

tests for the presence of methamphetamine. Any physical evidence would have dissipated before Avants started representing McLaughlin.

An expert also would not have been able to testify about the effects that methamphetamine had on McLaughlin. This court did not permit Dr. Lipman to testify whether McLaughlin himself was suffering from a methamphetamine-induced psychosis. Dr. Lipman did create a report. The report is instructive, not for its conclusions, but for the methods Dr. Lipman used. He interviewed McLaughlin. McLaughlin told Dr. Lipman his history with drug abuse and his recollection of what happened on December 10, 2002. Evidentiary Hearing Ex. 58, at 2-13.

The Nevada Supreme Court had a very similar situation before it in Walker v. State, 944 P.2d 762 (Nev. 1997). Walker was charged with first-degree murder with the use of a deadly weapon and robbery with the use of a deadly weapon. Walker tried to have an expert testify about his level of intoxication at the time of the offense, as part of a voluntary-intoxication defense. The expert had interviewed Walker about his medical history. The expert also reviewed hospital records. He made a determination about Walker's blood-alcohol content at the time of the offense, and he communicated that determination to the defense. The Nevada Supreme Court noted that the expert made his determinations for the purposes of litigation, not for the purposes of medical diagnosis or treatment. The Nevada Supreme Court then concluded that the testimony was not admissible "under the medical diagnosis exception to the hearsay rule, [Nev. Rev. Stat. §] 51.115." 944 P.2d at 774. It held that the expert was not a disinterested witness, "but made his report at the request of defense counsel." Id. at 774. It also noted that the expert's conclusions were partly based upon information that the expert had obtained from interviewing Walker. Id. at 774.

Dr. Lipman's report is similar in every way. He created the report not for medical diagnosis or treatment, but at the request of McLaughlin's counsel for the purposes of this habeas corpus action. Dr. Lipman based his conclusions at least in part upon McLaughlin's statements. Under Walker, the report would contain inadmissible hearsay. If McLaughlin wanted the jury to hear what he was thinking at the time, then he would have needed to testify himself. Avants did not want McLaughlin to testify because the prosecution then could use McLaughlin's history of

8

1  felony convictions against him.  Ex. 125 at 22-23 (ECF No. 31-9 at 23-24).  That was a cogent
2  strategic decision.

3  However, Avants had one other source of evidence of how methamphetamine affected
4  McLaughlin: Steven Glenn.  Glenn almost testified at the preliminary hearing that McLaughlin
5  appeared high.  Ex. 5 at 131 (ECF No. 28-5 at 132).  Abigail Goldman, investigator for
6  McLaughlin's current counsel spoke with Glenn.  Goldman's declaration contains hearsay, but the
7  court will assume that Glenn's testimony would have been the same as his statements to Goldman,
8  but subject to cross-examination.

9  Glenn could have provided testimony that might have been useful to McLaughlin.[5]  As
10  already noted, he almost testified in the preliminary hearing that McLaughlin appeared high.
11  Glenn also testified that he had hit McLaughlin with a chair.  To Goldman, he said, "It couldn't
12  have been more obvious if he had a tattoo on his head that said, 'I'm high.'"  Ex. 155 (ECF No.
13  33-5).  Goldman related McLaughlin escaping from Glenn's hold and also McLaughlin bouncing
14  back from when Glenn hit McLaughlin against a wall; Glenn insisted that this was due to
15  McLaughlin's intoxication.  Id.  Goldman also related that Glenn said that people on drugs go "in
16  and out of it," and "at that moment, (McLaughlin) was gone."  Id.  This evidence probably was
17  sufficient for Avants to request and obtain an voluntary-intoxication instruction.

18  However, basing the intoxication defense upon Glenn's testimony had its risks, because
19  Glenn tended to exaggerate.  Glenn testified in the preliminary hearing that, on the date of
20  McLaughlin's attack, he had 27 years of tactical experience.  Ex. 5 at 131 (ECF No. 28-5 at 132).
21  Glenn was 32 years old on that date.  Ex. 131 (ECF No. 33 at 4).  Glenn effectively was saying
22  that he had been working since he was five.  Glenn testified at the preliminary hearing that, after
23  McLaughlin had dropped his first knife, he suddenly produced a butcher knife 12 to 14 inches
24  long.  Ex. 5 at 132-33 (ECF No. 28-5 at 133-34).  This knife did not exist.  Instead, an
25  investigator found a broken, inexpensive bread knife.  Ex. 49 at 87-89 (ECF No. 29-3 at 24-25).
26  As McLaughlin himself notes, the social services office had a table with bagels; it also likely had
27  the a knife to cut those bagels, and McLaughlin picked up the knife when he had lost his other

---

28  [5] The court hedges its words for the reasons explained in the following paragraph.

knife. ECF No. 27 at 21 n.5. In Goldman's interview with Glenn, Glenn said that he had been working for 15 years, which would be more reasonable than 27 years for a man of his age, but that included presidential security. Ex. 155 (ECF No. 33-5 at 2). He would have been grossly overqualified for being an unarmed security officer at a satellite county social services office. Finally, Glenn told Goldman that he had kicked McLaughlin in the groin, "sending McLaughlin '<u>three feet into the air</u>,'" but that blow did not faze McLaughlin. Ex. 155 (ECF No. 33-5 at 3). At the time, Glenn weight 225 pounds and McLaughlin weighed 185 pounds. Although the court has not conducted its own experiments or consulted its own experts, kicking 185 pounds three feet into the air from waist height seems to be beyond the abilities of a person. The point is that Glenn's statements are full of exaggerations that a prosecutor would use to attack the credibility of his observations of McLaughlin's state. Perhaps McLaughlin was not suffering under a methamphetamine-induced psychosis that gave him superhuman strength. Perhaps Glenn overestimated his abilities. Using Glenn to produce evidence of the effect of methamphetamine on McLaughlin would have given any reasonable attorney pause.

### 8. The facts of the case and the voluntary-intoxication defense

Assuming that Avants would not have had qualms about using Glenn, he still would need to determine whether an intoxication defense would work with the facts of the case. The court lays those facts out below:

1. McLaughlin showed delusional behavior in 1995 and 1996, and he had methamphetamine in his system at those times. Ex. 151 (ECF No. 33, 33-1).

2. On December 4, 2002, McLaughlin had applied for medical and rental assistance at the social services office. Shelleen "Shean" Abrams approved him for medical assistance and denied him for rental assistance. Ex. 49 at 133-34 (ECF No. 29-3 at 36).

3. McLaughlin's keys fell out of his pocket at the office. Ex. 125 at 38 (ECF No. 31-9 at 39).

4. McLaughlin called the office and learned that his keys were there. Ex. 125 at 38 (ECF No. 39).

5. On December 9, 2002, Alan White, McLaughlin's brother kicked McLaughlin out of his house. Ex. 125 at 37 (ECF No. 31-9 at 38).

6. McLaughlin went to the Pittman neighborhood of Henderson. Ex. 125 at 37 (ECF No. 31-9 at 38).

7. McLaughlin met Jason Johnson. They went to Johnson's mother's house and ingested methamphetamine. Ex. 125 at 37 (ECF No. 31-9 at 38).

8. In the morning of December 10, 2002, McLaughlin left Johnson and went to the house of Marva Bennett, his own mother. Bennett did not answer the door because McLaughlin appeared to be high. Ex. 153 (ECF No. 33-3).

9. McLaughlin remembered that he had left his keys at the social services office. He decided to go to the office to retrieve them. Ex. 125 at 38-39 (ECF No. 31-9 at 39-40).

10. At the office, he decided to ask to see the Abrams again for rental assistance based upon his changed circumstances. Ex. 125 at 38-39 (ECF No. 31-9 at 39-40).

11. McLaughlin filled out a yellow slip with his information. Ex. 125 at 38 (ECF No. 31-9 at 39).

12. McLaughlin handed the slip to Atkinson. Atkinson told him that he did not need to fill out a slip to get his keys. McLaughlin told Atkinson that he wanted to see if he could get assistance based on his changed circumstances. Ex. 49 at 96-97 (ECF No. 29-3 at 26-27).

13. Atkinson went to Abrams' office and told Abrams that McLaughlin was at the office. Abrams called out to McLaughlin that he already was denied rental assistance. Ex. 49 at 98 (ECF No. 29-3 at 27).

14. Abrams said that she would try to see McLaughlin before she departed for lunch, in case his circumstances had changed. Ex. 49 at 140 (ECF No. 29-3 at 37).

15. Gail Baldwin, the other social worker in the office, announced that the office will close for lunch, and that people would need to return after it re-opens. Ex. 49 at 101-02 (ECF No. 29-3 at 28).

16. Atkinson told McLaughlin that he could stay. Ex. 49 at 101-02 (ECF No. 29-3 at 28).

17. McLaughlin sat down and muttered something like, "What am I supposed to do? I don't have any place to live." Ex. 49 at 101-02 (ECF No. 29-3 at 28).

18. McLaughlin got up, asked where the restroom was, and went there. Ex. 49 at 103 (ECF No. 29-3 at 28), Ex. 51 at 63-64 (ECF No. 29-5 at 18).

19. Atkinson went outside to check on a client. Ex. 49 at 103 (ECF No. 29-3 at 28).

20. Atkinson opened the door, and saw McLaughlin standing there, holding a knife. Ex. 49 at 103 (ECF No. 29-3 at 28).

21. McLaughlin stepped outside of the office, and he stabbed Atkinson. He then tried to stab or cut her neck with the knife, stopped only because Atkinson put her hands in the way in time. Ex. 49 at 105-06 (ECF No. 29-3 at 29). Atkinson had, among other injuries, a stab wound to her stomach and a stab wound to her side. Ex. 49 at 111 (ECF No. 29-3 at 30).

11

22. Glenn heard the screaming, ran outside, and knocked McLaughlin off Atkinson. Ex. 50 at 27-29 (ECF No. 29-4 at 9-10).

23. McLaughlin attacked Glenn with the knife. Glenn dodged, and McLaughlin, who was aiming for the middle of Glenn's chest, stabbed Glenn in the right of Glenn's chest. Ex. 50 at 29-30 (ECF No. 29-4 at 10).

24. Glenn re-entered the building and tried to close the door. McLaughlin blocked the closure of the door by putting his hand on the door jamb. Ex. 5 at 130-31 (ECF No. 28-5 at 131-32).

25. McLaughlin re-entered the office. He stabbed at Glenn again, toward the middle of Glenn's chest. Glenn dodged. Ex. 50 at 31-32 (ECF No. 29-4 at 10)

26. Susan Rhodes, the supervisor, was inside the building, calling out for someone to call 911. Rhodes then realized that she was holding her cell phone. She started to call 911. McLaughlin then ran through doorway and stabbed Rhodes in her right side, above her waist, in the abdominal wall. Ex. 50 at 68 (ECF No. 29-4 at 19).

27. Rhodes tried to run away. McLaughlin stabbed her again, in her left side, above her waist, in the abdominal wall. Ex. 50 at 69 (ECF No. 29-4 at 20).

28. Glenn put McLaughlin in a hold. McLaughlin squirmed out of the hold and dropped the knife. Ex. 50 at 32 (ECF No. 29-4 at 10).

29. A melee with chairs and tables followed. Ex. 50 at 34 (ECF No. 29-4 at 11).

30. At some point in the melee, McLaughlin re-armed himself with the bread knife. Ex. 5 at 132-33 (ECF No. 28-5 at 133-34). See also Ex. 49 at 87-89 (ECF No. 29-3 at 24-25).

31. Gail Baldwin heard McLaughlin shout something like "You people think you can get by with anything. I'm going to show you that you can't." Ex. 50 at 12 (ECF No. 29-4 at 5).

32. Susan Rhodes heard McLaughlin laugh and say, "You'll never stop me." Ex. 50 at 70 (ECF No. 29-4 at 20).

33. Edward Johanns tried to assist Glenn. McLaughlin hit him with a piece of metal in the head, and cut Johanns. Ex. 51 at 18-20 (ECF No. 29-5 at 7).

34. The police arrived, guns drawn. McLaughlin quickly complied with their commands, and he was not combative. ECF No. 125 at 125-32.

35. McLaughlin was taken to the hospital. He told the emergency room personnel that he had taken marijuana. Ex. 125 at 40-41 (ECF No. 31-9 at 41-42).

36. McLaughlin did not tell the emergency room personnel that he has ingested methamphetamine, because that drug is socially unacceptable. Ex. 125 at 40-41 (ECF No. 31-9 at 41-42).

37. McLaughlin refused to sign the hospital's discharge papers. Ex. 151 (ECF No. 33 at 14).

12

38. At the police station, McLaughlin told the detective that he did not want to talk about what had happened. Ex. 2 at 2 (ECF No. 28-2 at 3).

An intent to kill a person does not require complicated thinking. Up to the point that McLaughlin stabbed Atkinson, he undoubtedly demonstrated the ability to form intent. Another person was near McLaughlin as he entered and exited the restroom. Ex. 51 at 63-64 (ECF No. 29-5 at 18). McLaughlin did not attack that person. He did not attack any of the people in the lobby. Instead, he walked out of the building and attacked an employee of the social services office that had denied him assistance. That demonstrates the ability to reason and to form intent. After Glenn intervened, then retreated into the building, McLaughlin blocked Glenn from closing the door, and then McLaughlin rushed toward the person who was visibly calling 911, Rhodes. That demonstrates the ability to reason and to form intent. In the melee that followed, McLaughlin lost his knife, but he then re-armed himself with another knife, either one that he had previously concealed on his person or one that he picked up from the bagel table. That demonstrates the ability to reason and to form intent. The melee continued until the police arrived. McLaughlin quickly complied with their orders. Stopping the fight when the situation no longer was favorable for McLaughlin demonstrates the ability to reason and to form intent. After that, McLaughlin deliberately did not tell the emergency room personnel that he had ingested methamphetamine, because it was socially unacceptable. At the police station, McLaughlin stood on his Fifth-Amendment right to remain silent. That demonstrates the ability to reason and to form intent.

If McLaughlin was suffering from a methamphetamine-induced psychosis that robbed him of the ability to reason, then it occurred in three distinct moments, separated by two moments in which he demonstrated the ability to reason: (1) From his first stab of Atkinson to rushing at Rhodes, who was trying to call 911; (2) from his initial stab of Rhodes to his re-arming himself with the bread knife; and (3) from his re-arming himself with the bread knife to the arrival of the police. In between those moments, McLaughlin demonstrated the ability to reason. He attacked the person who was trying to call for help, and he re-armed himself with a different knife once he was disarmed. Furthermore, even inside those moments, McLaughlin's attacks demonstrated an

13

1  ability to reason and to form intent. He did not slash and stab wildly. He targeted vital areas on
2  Atkinson's, Glenn's, and Rhodes' bodies.

3  Even with the additional evidence provided through the evidentiary hearing, the court
4  comes to the same conclusion that it did when it first denied the petition. Avants testified at the
5  state evidentiary hearing that a voluntary-intoxication defense has pitfalls. "[I]t's the concession
6  that your client is high on narcotics, and in many instances, jurors are going to be very—
7  extremely resistant to any argument that because somebody is high on narcotics, that their ability
8  to form intent is somewhat impaired." Ex. 125 at 22 (ECF No. 31-9 at 23). In McLaughlin's
9  case, those pitfalls would be even worse. He could not argue to the jury that McLaughlin was
10 psychotic throughout December 10, 2002. The facts proved otherwise. The defense of voluntary
11 intoxication would coincide with the moments, and only with the moments, that McLaughlin was
12 actually attacking people, bookended and divided with indisputable examples of the ability to
13 reason and to form intent. A reasonable attorney in Avants' position would realize that he would
14 be arguing to the jury an incredible psychosis-off, psychosis-on, psychosis-off, psychosis-on
15 defense. Even if he tried to blur McLaughlin's actions, any prosecutor would have brought
16 attention to what the defense actually was and discredited it.

17 Perhaps Avants should have investigated the possibility of the voluntary-intoxication
18 defense. Ultimately, however, even if Avants did investigate the defense, he would have ended
19 up realizing that the facts of the case were incompatible with presenting a credible voluntary-
20 intoxication defense. The court finds that Avants did not perform deficiently when he did not
21 present a voluntary-intoxication defense.

22 **B.     Prejudice**

23 Even if Avants performed deficiently, McLaughlin did not suffer prejudice. The court
24 refers to the facts outlined in the section above. There is no reasonable likelihood that the jury
25 would have accepted that McLaughlin had no intent to kill, based upon a theory that McLaughlin
26 suffered from a psychosis that switched on and off coincidentally with those moments that the
27 prosecution needed to prove that McLaughlin was intending to kill people.
28

### C. Certificate of Appealability

To appeal the denial of a petition for a writ of habeas corpus, McLaughlin must obtain a certificate of appealability, after making a "substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Having reviewed ground 1 de novo, the court determines that reasonable jurists would not find its conclusions to be debatable or wrong. The court will not issue a certificate of appealability.

## V. Conclusion

IT THEREFORE IS ORDERED that the first amended petition for a writ of habeas corpus (ECF No. 27) is **DENIED**.

IT FURTHER IS ORDERED that a certificate of appealability will not issue.

IT FURTHER IS ORDERED that the clerk of the court enter judgment accordingly and close this action.

DATED: April 7, 2021.

JAMES C. MAHAN
United States District Judge